In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1338

JOHN W. MULLIN, II,

*Plaintiff-Appellant,*

*v.*

TEMCO MACHINERY, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00941-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED SEPTEMBER 20, 2013 — DECIDED OCTOBER 10, 2013

Before WOOD, *Chief Judge,* and BAUER and FLAUM, *Circuit Judges.*

FLAUM, *Circuit Judge.* John Mullin, II, brought suit alleging that he was fired because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* He was an employee with an allegedly less than sterling performance as a follower of corporate policy. He was also the oldest—and most profitable— salesman for a company that sells fire trucks and other

rescue equipment, Temco Machinery, Inc. After Temco fired the fifty-six year old Mullin, it quickly hired two inexperienced salesmen in their twenties. Mullin brought suit, and the district court granted summary judgment to Temco. For the following reasons, we reverse and remand.

## I. Background

In 1990, Mullin, then age thirty-six, began working for Midwest Fire & Safety as a salesman. Midwest Fire & Safety was the authorized dealer in Indiana for Pierce Manufacturing, which makes custom fire trucks and other rescue equipment. In 2006, Temco purchased Midwest Fire & Safety and retained its sales staff, including Mullin, then age fifty-two. As a sales associate, Mullin's responsibilities included selling fire trucks, traveling throughout his assigned territory (portions of central and southern Indiana), building client relationships, and participating at conventions and fire department activities. Most of Temco's salesmen are over the age of forty because the job requires in-depth knowledge of the industry and its products. During Mullin's tenure at the company, Temco typically employed between four and six sales associates in Indiana.

Mullin handled approximately 250 client accounts for Temco. In 2006 or 2007, the CEO of Temco, Michael Mikoola, took one account away from Mullin in response to criticism by a fire chief. In both 2008 and 2009, Mullin won Temco's Salesman of the Year Award. Temco presents this annual award to the sales associate who sold the most fire trucks during the company's preceding fiscal year. In 2008, Mullin sold six fire trucks, and the other three Indiana salesmen sold four, two, and two fire trucks, respectively. Mullin's 2008 sales represented 42% of the total number of fire trucks

sold in Indiana and generated 56% of the total profit. In 2009, Mullin sold eight fire trucks, and his three colleagues sold seven, four, and one fire truck, respectively. Mullin's 2009 sales represented 40% of the total number of fire trucks sold in Indiana and generated 52% of the total profit.

In November 2009, Temco hired an experienced manager, Ronald Baylog, as Vice President and General Manager of the Indiana sales division. The Indiana sales force was not meeting Temco's and Pierce's expectations, a fact that was relayed to the salesmen. Temco's executives directed Baylog to evaluate and manage the Indiana sales division. They hoped Baylog would improve performance, and they sought his assessments and recommendations. Baylog became Mullin's immediate supervisor, a role he occupied through the date of Mullin's firing.[1]

Baylog implemented three new policies for the Indiana sales division. He required the sales staff, including Mullin, to (1) complete and submit weekly contact/call reports in order to track potential customers; (2) attend and participate in weekly Monday morning sales meetings; and (3) help classify customers into higher- and lower-value targets, and call on them afterward. As detailed below, the parties have quite different accounts of Mullin's compliance with these new policies.

The month of May 2010 is important to this case. On May 5, 2010, Temco fired an Indiana sales associate, Michael Orrico, who was in his fifties. On the same day, Temco hired

---

[1] Baylog no longer works at Temco. He voluntarily retired on December 31, 2010.

Andrew Wolka, then twenty-four years old, and told Wolka not to report to work until May 14, 2010. Around the same time, it also hired Matthew Timmer, then age twenty-nine. On May 13, Mullin was fired. Temco's CEO, Mikoola, told Mullin he was being fired because "[w]e are paying you too much for your sales."

On May 14, the next day, Andrew Wolka and Matthew Timmer attended the Pierce Sales Meeting in Appleton, Wisconsin on Temco's behalf. Mullin had been scheduled to attend this annual meeting. Wolka and Timmer both officially started working for Temco on May 24, 2010; Wolka began as a full-time sales associate in Indiana, and Timmer as a part-time sales associate in Indiana because he was also a fireman. Wolka's and Timmer's contractual responsibilities were the same as Mullin's had been. Neither Wolka nor Timmer had any experience selling fire trucks, as Mikoola and Baylog both acknowledged in depositions.[2]

On November 8, 2010, Mullin filed a charge of age discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that he was terminated because of his age. On November 30, 2010, Temco submitted a position paper to the EEOC, stating that Mullin was fired for lack of performance. Temco alleged that Mullin's sales performance had declined; that Mullin refused to make sales calls or call on accounts, despite instructions by his superiors

---

[2] For instance, Baylog said of Wolka, "he was very green and had no knowledge of our products or no knowledge of really how to work a territory." Similarly, Baylog said of Timmer, "he's a young guy, didn't have any experience."

to do so; and that Mullin used his Temco email account "to communicate with a representative of a competing company concerning matters that were inappropriate" for someone in his position. After the EEOC issued Mullin a right to sue letter, he filed suit in the U.S. District Court for the Southern District of Indiana.

In several depositions, Temco executives offered the following characterizations of the events at issue in this case. Baylog asserted that he was "absolutely" "disappointed" when Mullin allegedly failed to attend two events that he was supposed to. These events were hosted by "good customers" (specifically, Wayne Township Fire Department and Speedway Fire Department). Mullin contests these allegations, stating that he never received an invitation to one event and that he in fact attended the other, which multiple other individuals confirmed. Baylog also alleged that Mullin failed to complete his contact/call reports in a timely fashion, did not consistently attend Monday morning meetings, and more generally underperformed and lacked organizational skills.

Temco CEO Mikoola also expressed dissatisfaction with Mullin's performance, including certain sales that Mikoola felt Mullin had lost. When Mikoola was asked when he decided to fire Mullin, he explained that a particular incident was "the straw that broke the camel's back." A client, the Westfield Fire Department, had sent representatives to visit a factory, and Mullin was responsible for leading the factory visit. According to Mikoola, Mullin simply "didn't show up" to work, which left the client "looking for him" at the factory. "I heard later John [Mullin] got sick or something, but didn't call anybody or tell anybody. It was rather a

pretty substantial embarrassment for us," Mikoola said. According to Mullin, though, this serious allegation is entirely inaccurate. Three Westfield Fire Department employees all testified that Mullin was with them the entire time and did a good job of showing them around the factory.

Finally, when asked about the twenty-four year old Wolka, Mikoola testified as follows.

> Q: What were Mr. Wolka's strengths?
>
> A: Well, he was a young individual, to put it mildly, very, very inexperienced. But he was a pleasant person, promised us—or I should say made some claims that he would do an aggressive job, and get out there and drive a demo. He acquired a CDL, Commercial Driver's License, to drive the demos. And, you know, so we, you know, our thought process on him was he was a young guy, give him a shot [to] drive around the state showing fire trucks and learn the business.
>
> Q: … What were Mr. Wolka's weaknesses?
>
> A: Well, his youth, and the gist, he didn't want to—the time commitment, he wasn't willing to put the time in to do what needed to be done. He had another interests [sic], to put it mildly.

Ultimately, Temco moved for summary judgment, which the district court granted. The district court rejected Mullin's allegation that Temco had provided shifting and inconsistent explanations for his firing—explanations that Mullin claimed were pretextual. The court concluded that Temco had legitimate reasons to be unsatisfied with Mullin's

performance and allegedly uncooperative nature. Mullin timely appealed.

## II. Discussion

Mullin challenges the district court's entry of summary judgment. We review the district court's decision de novo, construing all facts and drawing reasonable inferences in the light most favorable to Mullin, the non-moving party. *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012).

Mullin contends that Temco fired him because of his age, in violation of the ADEA. The ADEA prohibits an employer from "discharg[ing] any individual … because of such individual's age." 29 U.S.C. § 623(a)(1); *see also* 29 U.S.C. § 631(a) (limiting protections to those over forty years old). To establish an ADEA violation, "an employee must show that age actually motivated the adverse employment action. Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome." *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010) (citations omitted).

We have previously explained that an employee may prove discrimination through the direct or indirect methods of proof. *Fleishman*, 698 F.3d at 603. Mullin has pursued the direct method, which itself can be proved through direct evidence or circumstantial evidence. Direct evidence requires that the employer admit its discriminatory intent (e.g., the "smoking gun" case). *Id.* The far more common

case relies on circumstantial evidence, which "allows the trier of fact 'to *infer* intentional discrimination by the decisionmaker.'" *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). Circumstantial evidence typically includes "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). Circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Van Antwerp*, 627 F.3d at 298 (citation and internal quotation marks omitted). At bottom, as we have recently emphasized, a plaintiff seeking to survive summary judgment must produce enough evidence that a rational jury could conclude that the employer took the adverse action against the plaintiff because he is a member of a protected class.[3]

---

[3] *See, e.g.*, *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013) (citing, inter alia, *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("In order to defeat summary judgment, the plaintiff one way or the other must present evidence that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any noninvidious reason.")).

Applying these principles, a reasonable jury could conclude that Temco fired Mullin because of his age. Mullin has put forth ample circumstantial evidence, including examples of suspicious timing and ambiguous statements. Moreover, each of Temco's alleged reasons for firing Mullin is either genuinely contested, seemingly inaccurate, or both.

Mullin's first piece of circumstantial evidence is the suspicious timing of Temco's personnel changes. On May 5, 2010, Temco fired one of Mullin's fellow salesmen, Michael Orrico, who was in his fifties. On the same day, the company hired a twenty-four year old, Wolka, but told him not to report to work until May 14. Around this time, Temco also hired a twenty-nine year old, Timmer. On May 13, the company fired the fifty-six year old Mullin. The next day, Wolka and Timmer represented Temco at Pierce's annual meeting, filling the position that Mullin would have held. Soon after, both men officially went on Temco's payroll. Of course, companies must be able to fire and hire employees. But in this case, a highly experienced and relatively successful salesman was fired at precisely the time the company hired two "very inexperienced" men who had never been in sales.

The *immediate* temporal connection between these personnel decisions is of the sort that has previously raised some concern. For example, in *Filar v. Board of Education of Chicago*, 526 F.3d 1054 (7th Cir. 2008), a school experienced a funding shortfall and needed to demote one teacher. The principal then engaged in "a flurry of personnel decisions," quickly promoting every teacher except the sixty-nine year old plaintiff. *Id.* at 1058. The plaintiff thereby became the "least senior" teacher and was demoted, even though she

was more qualified than some of her colleagues. *Id.* The court found "the timing of [the principal's] decisions" one factor in its decision to reverse summary judgment and remand for trial. *Id.* at 1064; *see also Piraino v. Int'l Orientation Res., Inc.*, 84 F.3d 270, 274-75 (7th Cir. 1996) (promulgating maternal leave policy immediately after employee mentioned she was pregnant). As in *Filar*, we are potentially troubled by a flurry of personnel changes that operate to the detriment of a much older, more qualified employee.

The hiring of Wolka and Timmer is arguably more suspicious given that Temco went to great lengths to emphasize how "old" its employees are. For instance, Baylog testified that Mullin was "at the age where he should have been in his prime … . [I]t's the best time in a salesperson's life [—] between say 45 and 65 is their most productive years. Those are the people you search out and try to hire." Yet immediately after firing Mullin (and another man in his fifties), Temco hired two men in their twenties who were "very, very inexperienced." The district court described these developments as "potentially suspicious." And after Temco described Mullin's firing as a financial decision, it was certainly unusual to hire two people with no experience for nearly the same compensation as the reigning two-time Salesman of the Year.

The next category of circumstantial evidence consists of Mikoola's ambiguous statements about age. The parties dispute the importance and interpretation of Mikoola's references to Wolka's age. Mikoola was asked Wolka's strengths and weaknesses. In his answers to both questions, Mikoola mentioned Wolka's youth. In addition, in the question about Wolka's strengths, Mikoola commented, "our

thought process on him was he was a young guy, give him a shot [to] drive around the state showing fire trucks and learn the business." The district court found that, in context, Mikoola's comments suggested that he perceived Wolka's age as a weakness; that is one reasonable interpretation, but it is not the only one. Because Wolka's youth was explicitly part of Temco's "thought process" in hiring him, the record is at least ambiguous. A jury is the appropriate body to evaluate the significance of these statements.

Next, with respect to Temco's alleged reasons for firing Mullin, Mullin argues that the company's justifications are shifting, inconsistent, and a pretext for discrimination. To demonstrate a material issue of fact as to pretext, Mullin must show that "either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). A mere mistake by an employer does not constitute pretext; instead, pretext "is a phony excuse." *Id.* Where an employer proffers "more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons." *Id.* But the court will not reexamine business decisions as a "super-personnel department"; instead, the important consideration is "whether the employer gave an honest explanation of its behavior." *Id.* (citation omitted). Finally, if the employer changes its story, that constitutes "evidence of pretext, and entitles [the plaintiff] to a trial on the issue of the reason for his termination." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999) (citations omitted).

Applying these concepts, each of Temco's alleged reasons for firing Mullin is either genuinely contested, seemingly inaccurate, or both. Certain of Temco's alleged reasons raise potential credibility issues, which a jury should resolve.

Initially, Temco CEO Mikoola told Mullin that he was being fired for financial reasons: "We are paying you too much for your sales." Temco did not offer to reduce Mullin's salary. It did hire two new employees, who had precisely the same job description as Mullin. Neither possessed any experience, yet one was paid $48,000 to work part-time, while the other was paid $42,000 to work full-time and handle some of the territory that Mullin had handled. Mullin's salary had been $56,400. If we credit Mikoola's explanation, Temco's personnel decisions seem puzzling.

Baylog also suggested that Mullin was not replaced by these two young salesmen because Temco split up Mullin's territory among three people: an existing salesman, a twenty-four year old novice (Wolka), and a sixty-five year old named John Erlandson. Yet according to Mikoola, Erlandson was actually a handyman. He had never sold a fire truck, was never on paid commission (as the company's salesmen were), and was not in a sales role when Mikoola testified. Erlandson may never have actually become a sales associate. However, Temco's 2010 records list him as such and note his age, sixty-five. Indeed, before the EEOC, Temco relied upon Erlandson's hiring in computing the average age of its salesmen. This may be an innocuous administrative error, but it also might not be. Temco had just fired its oldest sales associate. A rational jury could conclude that Temco then sought to "even out" the ages of its salesmen and its new hires.

Another factor motivating Mullin's firing was Baylog's stated view that Mullin had let down Temco and two of its important customers by failing to attend client events. Mullin's contractual responsibilities included attending such events. It was allegedly very disappointing, to Baylog and the customer alike, when Mullin failed to attend the Speedway Fire Department event. According to Baylog, Mullin had planned to attend this event, but then told Baylog that he had "accidentally turned the wrong way" on the highway and could not make it as a result. Baylog's account is contested. Mullin testified that he in fact attended this event, and three Speedway employees gave depositions confirming his attendance.

An additional factor motivating Mullin's firing—indeed, the "straw that broke the camel's back" for Mikoola—was the "embarrass[ing]" incident in which Mullin allegedly failed to show up to work, leaving several visitors to wander around the plant unsupervised. That account is contested, too. The visitors each gave depositions confirming that Mullin was with them at all times and gave them a good tour. The district court was correctly troubled by this allegation, stating that it "leaned toward a 'phony excuse.'" Of course, a mere mistake is not pretext. *Hudson*, 375 F.3d at 561. But enough inaccuracies might allow a jury to make reasonable inferences about credibility.

Lost sales also played a role in Mullin's firing, according to Mikoola. Lost sales are obviously significant in evaluating a salesman, especially because fire trucks are not a high-volume consumer item, so each lost sale might matter a great deal. However, Mikoola acknowledged that Temco loses sales fairly regularly—"it is just a fact of, you know, the

market." He also said that each of Mullin's colleagues had lost sales, but none had been fired as a result. Furthermore, Mullin has contested the allegation that *he* lost sales, arguing that the lost sales resulted from Mikoola's explicit directions with respect to price. A CEO may choose to scapegoat; but when a CEO points to conduct as the grounds for termination, it is less credible if the employee was simply (or allegedly) following the CEO's instructions. Therefore, there is a significant disputed fact on this ground, and such issues of credibility are not resolved at summary judgment.

More generally, the company claims that Mullin underperformed. Temco asserts that Mullin's performance was declining, a position Mullin contests. After leading his colleagues in fiscal-year 2009 and 2008 sales, Mullin was again leading them in 2010 sales prior to his termination. Temco discounts his Salesman of the Year Awards, arguing that he had the "best" territory and should have sold more fire trucks, especially compared to his allegedly underachieving colleagues. Mullin disputes the characterization of his territory as the most desirable market, and this dispute is material: if Temco's characterization is inaccurate, it would enhance Mullin's qualifications as compared to his somewhat younger colleagues whom Temco did not fire. Mullin was the oldest salesman during his tenure at Temco.

Temco also claims that Mullin failed to submit his call reports in a timely fashion. Mullin disputes this allegation. Two email exchanges between Mullin and Baylog suggest that Mullin was late on those particular occasions, but the company's allegations seem more wide-ranging than that. Temco faces an evidentiary challenge here: it claims that

Mullin failed to submit his call reports promptly, yet it has destroyed those reports. "An employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case." *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002). Nonetheless, Mullin correctly asserts that Temco's destruction of evidence deprives him of the opportunities to demonstrate his compliance and to compare his performance with that of his colleagues. At the summary judgment stage, we accept Mullin's version of the facts.[4]

Finally, Temco suggests that Mullin was insubordinate for failing to attend Monday morning meetings consistently, as Baylog required of sales associates. Mullin's response is three-fold. First, Mullin testified that everyone missed these meetings from time to time, Baylog included. Given the in-person nature of the industry, which requires travel, it was inevitable that salesmen would occasionally miss Monday morning meetings or need to reschedule them. Second, he argues that he in fact attended these meetings, except when he was with a customer or at the Pierce factory in Wisconsin. Temco's business was selling fire trucks, and certain fire departments met on Monday mornings. If Mullin could get on the agenda during these departments' meetings, he—and therefore Temco—had a better chance of selling. Third, according to Mullin, Baylog never expressed any dissatisfaction with Mullin's job-related absences or need to

---

[4] Indeed, there is an additional disputed fact concerning whether Temco's records were destroyed before or after Mullin filed his charge of discrimination with the EEOC.

reschedule meetings. Thus, the parties genuinely contest the merits of this alleged justification as well.

Mullin also contests the allegation that he communicated inappropriately with a sales representative from another company. Because Temco has not produced the allegedly inappropriate email corroborating its allegation, we accept Mullin's argument at this stage.

Standing alone, none of these incidents, events, or alleged justifications would likely suffice for Mullin to survive summary judgment. In combination, however, they point to a string of questionable conduct, from the suspicious timing of personnel decisions to ambiguous statements about age to multiple seemingly inaccurate allegations. Mullin genuinely contests all of Temco's accusations. He has put forth sufficient evidence that the jury should resolve the many material factual questions, as well as the credibility issues underlying them. Of course, we express no view on the ultimate merit of Mullin's claims. When, as here, the "facts are susceptible to two interpretations," the Supreme Court has cautioned against granting summary judgment "too readily." *Filar*, 526 F.3d at 1066 (citation and internal quotation marks omitted).

### III. Conclusion

For the foregoing reasons, we REVERSE and REMAND.