In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-3696

STACY ALEXANDER and KIM ROGERS,

*Plaintiffs-Appellants*,

*v.*

CASINO QUEEN, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 10-CV-908-WDS — **William D. Stiehl**, *Judge*.

ARGUED NOVEMBER 15, 2013 — DECIDED JANUARY 8, 2014

Before FLAUM and HAMILTON, *Circuit Judges*, and
KAPALA, *District Judge*.[*]

FLAUM, *Circuit Judge*. Stacy Alexander and Kim Rogers
are African-American women who used to work as cocktail
waitresses for Casino Queen, Inc. in East St. Louis, Illinois.
They allege race discrimination, retaliation, and a hostile

---

[*] Of the Northern District of Illinois, sitting by designation.

work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court granted Casino Queen summary judgment on all three claims. We affirm as to the hostile work environment claim, but reverse and remand as to the race discrimination and retaliation claims.

## I. Background

Plaintiff Alexander worked at Casino Queen from 1993 until July 2010, when she began an extended medical leave of absence. Her employment ultimately ended in February 2012. Plaintiff Rogers worked at Casino Queen from 1994 through May 2010, when she voluntarily resigned. Both were cocktail waitresses for the duration of their employment; neither ever applied for a different position. Both were also members of a union and therefore subject to a collective bargaining agreement ("CBA"). This lawsuit is based on Alexander's experiences between October 11, 2007 and July 2010, and Rogers' experiences between October 11, 2007 and May 2010.[1] Their allegations fall into three buckets: (1) floor reassignments, (2) discipline, and (3) privileges.

### A. Floor reassignments

Plaintiffs' most significant allegation from a financial perspective concerns floor reassignments. At Casino Queen, a cocktail waitress made $7 to $8 per hour in salary—about $60 per day—and made $40 to $160 or more per day in tips. Tips thus comprised about 40% to 73% of a waitress's total

---

[1] October 11, 2007 is the date that Alexander and Rogers filed their first lawsuit against Casino Queen. The district court dismissed that suit due to the misconduct of the plaintiffs' then-attorney, and we affirmed, *see Alexander v. Casino Queen, Inc.*, 321 Fed. App'x 509 (7th Cir. 2009).

compensation. Three to six cocktail waitresses worked the casino floor at any given time. Each waitress was assigned to cover a specific area of the casino floor (e.g., the blackjack tables, the penny slot machines, etc.). Plaintiffs state that waitresses usually did not receive large tips from patrons playing the "penny slots," so that area of the casino floor was not a desirable assignment. By contrast, average tips were higher at the "high roller" tables, so that area was desirable. The waitresses periodically bid on shift assignments based on their seniority. By 2008, Alexander and Rogers were the second- and sixth-most senior waitresses, respectively, allowing them to win their preferred areas of the casino floor. On days when a waitress was absent or went home early, the remaining waitresses received new floor assignments, for that day only, to ensure that the casino floor was fully covered. Plaintiffs state that when these day-by-day reassignments occurred, Casino Queen "almost always" moved them to less lucrative areas of the floor, while white waitresses (often with less seniority) were reassigned to cover what had been the plaintiffs' desirable areas. Plaintiffs allege that these reassignments occurred up to twice per week and cost them about $50 per day.

For instance, Alexander alleges that in July 2009, she was removed from her lucrative table-game area on three consecutive days to cover for another waitress on medical leave. A less senior white waitress covered Alexander's area. Casino Queen replies that Kelly Carey, plaintiffs' supervisor, administered floor assignments "consistently pursuant to pre-arranged floor plans without regard to any particular waitress's race." Carey, who is white, was a Food and Beverage Director.

Relatedly, Alexander also alleges that in late 2008, she bid for and received an area with dollar slot machines, which was considered a good-tip area. A few months later, though, the boundaries of her assigned area were redrawn (without conducting a rebid), and as a result, she lost the dollar slots and a white waitress received them.

## B. Discipline

Plaintiffs next allege that they were disciplined more harshly than their white colleagues with respect to tardies, absences, breaks, and eating at work. On both October 3 and November 3, 2008, Alexander claims that she was written up for being tardy when she was actually on time. (She asked the H.R. Director for copies of her time-clock records.) On November 6, Alexander was one minute late, and Casino Queen then suspended her for a day because of her three alleged tardies, resulting in a day of lost pay and tips. Rogers, too, was written up for being late on November 3, 2008, even though time records showed that she clocked in at 7:43 a.m. for her 7:45 a.m. shift. Plaintiffs say that a white cocktail waitress, Kim Lay, arrived late to work 42 times in an eleven-month period, according to Rogers' notes. In its brief, Casino Queen says that under the CBA, eight tardies in a rolling 12-month period results in an employee's suspension. Plaintiffs state that nine tardies in a rolling 12-month period results in termination. Kim Lay was still working at the casino when Rogers left in May 2010.

Plaintiffs also allege that when they arrived to work quite late—between one and 2.5 hours late—Kelly Carey did not allow them to work that day. That day counted as an "absence" and plaintiffs lost their base pay and tips. The situation was handled differently, however, when the

cocktail waitress was white. For example, when Nicole Khoury was a "no call/no show"—i.e., she neither came to work nor notified Casino Queen of her absence—Casino Queen called her in to work (2.5 hours late) and she worked the rest of her shift. A "no call/no show" should result in automatic termination, plaintiffs say. Similarly, on July 13, 2009, Kim Lay allegedly was more than one hour late, but was allowed to work her shift.

On February 16 and 24, 2008, Alexander was written up for absences that should have counted as leave under the Family and Medical Leave Act of 1993. Casino Queen was supposed to remove the write-ups from her file, but did not; as a result, when Alexander received a third absence in October (due to a family emergency), Kelly Carey used the "three" absences to suspend and then fire Alexander. Alexander involved her union and was reinstated after missing seven days of work. She recovered her base pay for those seven days, but not the tips she would have earned.

On December 21, 2008, and again in April 2009, Carey wrote up Alexander for stopping at the restroom after her authorized lunch break before she returned to the casino floor. Alexander says that she saw white cocktail waitresses repeatedly do this; in fact, Alexander and Rogers allegedly saw white waitresses taking extended breaks *with* Carey, including at times that these waitresses were not scheduled for breaks. Carey also wrote up Rogers for spending too much time standing at the bar when Rogers was actually waiting to pick up drinks. In contrast, Rogers says that white waitresses, on several occasions, stood at the bar talking to each other or white bartenders for extended periods. On November 17, 2009, Rogers saw cocktail waitress Kim Lay

talking on the casino floor to her boyfriend, who was also a casino employee. Carey allegedly walked by the couple twice before saying something to them.

On June 20, 2008, Rogers received a write-up for having food at her work area—a violation of company policy. When Rogers reported the write-up to the union representative, he told her that on the same day, a white cocktail waitress named Brandie was caught by management eating food at the bar. Brandie's food was taken away but she did not receive a write-up. Rogers saw white cocktail waitresses eating on the casino floor many times, including Corena Piatt on four specific dates in 2009; it is unclear, however, whether management saw these incidents.

Finally, in March 2010, Rogers told H.R. representative Kim Cushon (who is black) that she believed Carey was watching her more closely than white cocktail waitresses, for instance by following Rogers into the bathroom on multiple occasions. Rogers said that she thought Carey was harassing and retaliating against her. Cushon allegedly replied that it was Carey's "right" to single out Rogers.

### C. Privileges

Rogers alleges that Carey denied her requests for vacation or personal days without explanation, but routinely approved white cocktail waitresses' requests. In late May 2009, Carey allegedly denied Rogers' request for a day off the following Thursday. A few days later Carey approved the request of Michelle, a white cocktail waitress, for a day off the following Sunday. Plaintiffs state that Sundays were busier than Thursdays. In addition, in December 2008, Rogers' aunt died and she asked Carey for an emergency

day off to attend the funeral. Carey denied this request. Several months later, Carey granted a white waitress's request for an emergency day off because a relative was threatening suicide.

Rogers says that on May 20, 2010, she attempted to give two weeks' notice that she was resigning; white cocktail waitresses such as Kim Turner, Kim Gann, and Brandie had publicly announced their resignations and then continued to work for two weeks afterward. But the day that Rogers gave two weeks' notice, Casino Queen's H.R. representative told Rogers not to come back to work. Rogers asked if she could revoke her notice and work two more weeks, but was told she could not. She reported to work the next day anyway, but Casino Queen security guards escorted her out of the casino. Rogers received her base pay for those two weeks, but not the tips she would have earned.

Plaintiffs protested Casino Queen's alleged discrimination, but to no avail. Rogers repeatedly lodged internal complaints, complained to Carey that she thought she was being treated differently because of her race, filed race discrimination complaints with the H.R. Director, protested to a general manager, and complained to Carey's boss, Dominic Gramaglia, that her floor reassignments caused her to lose tips. On one occasion, Gramaglia accused Rogers of insubordination and sent her home early. In 2009, two Casino Queen officials interviewed Rogers about her race discrimination complaints and said they would conduct an investigation. Rogers says that she never heard back from them or anyone else about an investigation.

Alexander filed a charge of race discrimination with the EEOC in November 2009, and Rogers followed suit in

February 2010. Plaintiffs filed suit in federal district court in 2010. In 2012, the district court granted Casino Queen's motion for summary judgment on all three claims (race discrimination, retaliation, and a hostile work environment). The district court reasoned that plaintiffs did not prove an adverse employment action, which doomed their race discrimination and retaliation claims. The court also rejected their hostile work environment claim. Plaintiffs appealed.

## II. Discussion

We review the district court's decision de novo, construing all facts and drawing reasonable inferences in the light most favorable to the non-moving party, Alexander and Rogers. *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). In order to address plaintiffs' substantive allegations, we must first decide what evidence to consider; plaintiffs seek to rely on not only their own allegations, but also the depositions in another case, *Riley-Jackson v. Casino Queen, Inc.*, No. 07-cv-0631-MJR-PMF (S.D. Ill.) ("*Riley-Jackson*"). After deciding this evidentiary question, we will address plaintiffs' race discrimination claim, followed by their hostile work environment and retaliation claims.

### A.  The *Riley-Jackson* depositions

In *Riley-Jackson*, 72 African-American cocktail waitresses sued Casino Queen for race discrimination, retaliation, and a hostile work environment. Before that case settled, the parties took several depositions, some of which plaintiffs

seek to rely on here. The district court excluded these depositions under Federal Rule of Civil Procedure 32(a)(8), which permits a deposition taken in one action to "be used in a later action involving the same subject matter [and] the same parties." The district court reasoned that the parties in this lawsuit are not "the same" as in the *Riley-Jackson* suit. The weight of authority is that depositions can be the equivalent of affidavits, and are therefore admissible at the summary judgment stage. *See Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966 (9th Cir. 1981) (reasoning that depositions can meet Rule 56's requirements when they are "made on personal knowledge and set forth facts that were admissible in evidence"); *Tingey v. Radionics*, 193 Fed. App'x 747, 765 (10th Cir. 2006) ("As the case law reveals, [Rule 32] is primarily applied as a limitation on introducing deposition testimony *at trial*."); *Vondriska v. Cugno*, 368 Fed. App'x. 7, 8–9 (11th Cir. 2010) ("Depositions, even those taken without notice to or the presence of the later non-moving party on summary judgment, can" satisfy Rule 56's requirements for an affidavit); *see also* 7 Moore's Federal Practice § 32.06 (3d ed. 2013) ("A deposition may generally be used as the equivalent of an affidavit in motion practice, even though Rule 32 would bar receipt of the deposition as evidence at trial. If the deposition was taken under oath and was based on personal knowledge, it is at least the equivalent of an affidavit.").

We agree with the plaintiffs that, in a proper case, depositions from one case may be used at the summary judgment stage of another, even if Rule 32(a)(8)'s requirements are not met. Two conditions must be met for a case to be proper. First, the deposition must satisfy Rule 56's requirements for an affidavit or declaration—i.e., the

testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters. Fed. R. Civ. P. 56(c)(4). Second, the depositions from the other case must be part of "the record" in the present case, because Rule 56 states that a party must cite to "materials *in the record*." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). To satisfy the second requirement, the plaintiffs here needed to create a docket entry, with attachments, to ensure that the relevant *Riley-Jackson* materials were part of the record in the plaintiffs' case. The plaintiffs did not take this action—they never filed the *Riley-Jackson* depositions as part of the record in this case.

Plaintiffs argue that "the record" in this case includes documents filed only in another case because such materials are easily accessible in the era of electronic filing. We respectfully disagree. Despite technological advancements, "the record" still refers to the materials filed in this case. Therefore, we cannot consider the *Riley-Jackson* depositions.

## B. Race discrimination

Plaintiffs contend that Casino Queen discriminated against them because of their race, in violation of Title VII.[2] Title VII makes it unlawful for an employer to "refuse to hire … or otherwise to discriminate against any individual … because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs alleging discrimination can survive

---

[2] Plaintiffs technically bring their discrimination and retaliation claims under both Title VII and 42 U.S.C. § 1981. We analyze both claims under Title VII because the analysis for these two claims is generally the same under either statute. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008).

summary judgment through the direct or indirect method of proof (or both). *Mullin*, 732 F.3d at 776. Plaintiffs here proceed under both methods. Under the direct method, plaintiffs must provide either direct evidence or circumstantial evidence that supports an inference of intentional discrimination. *Id.* Direct evidence requires an admission of discriminatory intent, i.e., "smoking-gun" evidence. *Id.* Circumstantial evidence typically includes "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id.* (quoting *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)). Ultimately, a plaintiff facing summary judgment must produce sufficient evidence that a rational jury could conclude that the employer took the adverse action against the plaintiff *because* she belongs to a protected class. *Id.* (citing *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013)).

Under the indirect method, plaintiffs must first make out a prima facie case of discrimination, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which has four elements: they must demonstrate that (1) they are members of a protected class; (2) they were meeting their employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) at least one similarly situated employee, not in their protected class, was treated more favorably. *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011).

If the plaintiffs establish a prima facie case, then "the burden shifts to [Casino Queen] to articulate a legitimate, nondiscriminatory reason for [the adverse employment action] which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 725 (7th Cir. 2008) (citation and internal quotation marks omitted). If Casino Queen meets this burden, the burden returns to the plaintiffs to prove, by a preponderance of the evidence, that the proffered reason is a pretext for race discrimination. *Id.* While the indirect approach is often called a "burden shifting" method, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff[s] remains at all times with the plaintiff[s]." *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (citation omitted).

Casino Queen concedes the first two elements under the indirect method—membership in a protected class and meeting its legitimate expectations. We proceed now to the third and fourth elements. Because we ultimately conclude that plaintiffs can avoid summary judgment based on the indirect method of proof, we need not address their arguments under the direct method, although they remain free to offer all relevant evidence at trial.

### i. Adverse employment action

The district court concluded that the plaintiffs did not prove that they suffered an adverse employment action. Adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an

employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). To be actionable, an employment action "must be a significant change in employment status … or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (citation omitted). Adverse employment actions are often "economic injuries," *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002), but also "extend beyond readily quantifiable losses." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004) (citation omitted).

Under our precedents, the floor reassignments in this case constitute an adverse employment action because of the relative importance that tips had for these cocktail waitresses, given their compensation structure and the alleged frequency of these reassignments. Together, these points demonstrate a significant financial impact. This is crucial, because our cases emphasize the importance of a "significant" change in benefits. *See, e.g.*, *Lewis*, 496 F.3d at 653. Here, tips comprise anywhere from 40% to 73% of plaintiffs' compensation. It is true that patrons pay these tips, not the employer; thus, the causal connection is not immediate. Nonetheless, Casino Queen's alleged "decision caus[ed] a significant change in benefits" through a clear causal relationship. *Id.* At the summary judgment stage, we credit plaintiffs' allegation that Casino Queen supervisors knew that some areas average higher tips than others.

The district court came to this conclusion as well, but found plaintiffs' claims "speculative" because plaintiffs did

not "indicate how much in tips they lost" and because "their bidded areas only gave them a 'good potential for tips.'" We have said that "uncorroborated, self-serving testimony cannot support a claim if the testimony is based on speculation, intuition, or rumor or is inherently implausible. But testimony based on first-hand experience is none of those things." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citation and internal quotation marks omitted). Plaintiffs' claims are based on first-hand experience: Alexander and Rogers worked at Casino Queen for 18 and 15 years respectively, providing a basis for their statements (in the record) that they were reassigned up to twice per week, that these reassignments often took them to completely different and less lucrative areas of the casino floor, and that these reassignments hurt them financially. Plaintiffs' alleged losses are admittedly estimates, but based on their extensive experience, they were able to quantify their daily tips ($40 to $160 for Rogers, and $75 to $150 for Alexander), assert the frequency of their reassignments (up to twice per week), and estimate the daily impact of these reassignments ($50 per day). At this stage, that suffices. Plaintiffs have sufficient evidence of an adverse employment action to get to a jury.

### ii. Similarly situated employee

The remaining requirement in establishing a prima facie case of race discrimination is that plaintiffs demonstrate that at least one similarly situated employee, outside of their protected class, was treated more favorably than they were. A similarly situated employee must be "directly comparable" to plaintiffs "in all material respects." *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011)

(citation omitted). This is a "common-sense" analysis, "not an … inflexible requirement that requires near one-to-one mapping between employees." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008). We consider all relevant factors in making this determination, including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct. *Id.*

In this case, white cocktail waitresses are "directly comparable" to the plaintiffs in all material respects: they held the same position; Carey supervised and assigned work to all cocktail waitresses, and was responsible for discipline for all cocktail waitresses; the CBA "govern[ed] the terms and conditions of employment of all Casino Queen Cocktail Waitresses"; and the white waitresses' relevant conduct is quite similar as well. Plaintiffs allege that white cocktail waitresses received systematically better treatment because the white cocktail waitresses (1) were reassigned to higher tip areas each week, even though they were often less senior; (2) were repeatedly disciplined more favorably (e.g., Brandie eating food at work, or Kim Lay being allowed to arrive late 42 times in a one-year period where she would have been fired if she had been disciplined nine of those times); (3) were treated better with respect to privileges such as restroom breaks and requests for vacation and personal-days; and (4) were permitted to work for two weeks after submitting notice of their resignation, enabling them to earn more through tips (e.g., Brandie, Kim Turner, and Kim Gann). Plaintiffs therefore make out a prima facie case.

### iii.  Legitimate, non-discriminatory reason

The burden now shifts to Casino Queen to articulate a legitimate, nondiscriminatory reason for plaintiffs' treatment. With respect to disciplinary issues, Casino Queen argues that it simply disciplined plaintiffs for violations of company policy. With respect to floor reassignments, Casino Queen relies on the account of Kelly Carey, the plaintiffs' supervisor. Carey claims that floor reassignments were done in a race-neutral fashion according to various preexisting floor plans—not according to the CBA. Plaintiffs say they have never seen these "reassignment floor plans," nor had they heard of them until this lawsuit. Carey added that, pursuant to these preexisting plans, waitresses "absorb[ed]" other areas when a waitress was absent. Plaintiffs reply that "absorbing" implies *adding* contiguous areas, whereas plaintiffs were moved from one area of the casino floor to an entirely different one. The reassignment plan diagrams appear to support plaintiffs' testimony because they show plans for adding contiguous areas of the casino floor. Furthermore, it is quite difficult to imagine that pre-arranged, race-neutral plans would produce reassignments whereby African-American cocktail waitresses "almost always" received low-tip areas while white waitresses consistently benefited. At this stage, we must credit the plaintiffs' account. And in any event, this potentially after-the-fact justification could be merely a pretext for discrimination. *See Futrell v. J.I. Case*, 38 F.3d 342, 349 (7th Cir. 1994). The jury is the appropriate body to resolve these credibility disputes. *See Williams v. City of Chi.*, 733 F.3d 749, 752 (7th Cir. 2013). Accordingly, we conclude that plaintiffs have established a race discrimination claim.

### C. Hostile work environment

Plaintiffs next allege that Casino Queen created a hostile work environment by subjecting them to unfair suspensions, financially harmful floor reassignments, unjustified write-ups, and unusually close supervision. Plaintiffs state that Casino Queen knew about, but failed to remedy, their complaints of race discrimination.

Title VII's general prohibition against race discrimination by employers includes a prohibition against creating a "hostile or abusive work environment." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (citation omitted). Specifically, Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). "An actionable hostile environment claim requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Id.* The factors that we may consider in deciding whether the environment is hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

Plaintiffs' allegations are serious, but they do not quite rise to the level required to meet this test. *See, e.g., Scruggs v.*

*Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) ("To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an *abusive* working environment.") (emphasis added). We assume that this work environment was subjectively offensive, that the objectionable conduct was frequent, and that Casino Queen did little to respond to complaints of discrimination. But plaintiffs have not shown enough to prove that their work environment was "objectively offensive." This work environment was not physically threatening, nor was it openly racist, nor did it unreasonably interfere with plaintiffs' performance. *See Gentry v. Export Packaging Co.*, 238 F.3d 842, 851 (7th Cir. 2001) (holding it was reasonable for the jury to find a hostile work environment where, due to her immediate supervisor's alleged sexual harassment, the plaintiff "found it hard to concentrate on her work," hated her job, "often cried when she went to work," and "was treated for anxiety and depression"). Indeed, in her deposition, Alexander said that she liked everything about her job except Carey; if Carey had been fired, Alexander says that she would not have filed this lawsuit. Because "[t]he evidence is insufficient to show a workplace permeated with discriminatory ridicule, intimidation, and insult," we affirm the district court's grant of summary judgment. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004).

## D. Retaliation

Alexander and Rogers' final allegation is that Casino Queen unlawfully retaliated against them by reassigning them to less lucrative areas of the casino floor, wrongly terminating Alexander (even though she was ultimately

reinstated), removing the high-tip dollar slots from Alexander's assigned area, not permitting Rogers to work for two weeks after submitting her resignation notice, and Gramaglia's accusing Alexander of insubordination and sending her home for the day after Alexander complained about discriminatory floor assignments.

Like a discrimination claim, a claim of retaliation may be established through the direct or indirect method of proof. Plaintiffs proceed under the indirect method, which "mirrors that for discrimination." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). Specifically, plaintiffs must show that they "(1) engaged in a statutorily protected activity; (2) met [their] employer's legitimate expectations; (3) suffered an adverse employment action; and (4) [were] treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688 (7th Cir. 2010) (citation omitted). Under this method, plaintiffs "need not show even an attenuated causal link." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (citation omitted). If plaintiffs can establish a prima facie case, the burden then shifts to Casino Queen to produce a non-discriminatory reason for its employment action. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir 2007). If Casino Queen meets its burden of production, then plaintiffs must "demonstrate that [Casino Queen's] proffered reason is pretextual." *Id.* In this case, the parties agree that plaintiffs engaged in statutorily protected activity. Given that the rest of our retaliation analysis (under the indirect method) "mirrors" our discrimination analysis (under the indirect method), *Davis*, 368 F.3d at 788, we find

that plaintiffs satisfy their burden here as they did there.[3] We therefore reverse and remand on the issue of retaliation.

### III. Conclusion

For the foregoing reasons, we AFFIRM as to the hostile work environment claim, but REVERSE and REMAND as to the race discrimination and retaliation claims.

---

[3] Again, the first two requirements of the prima facie case are not in dispute. With respect to the third requirement, plaintiffs have alleged, inter alia, frequent removal from their high-tip areas of the casino floor in favor of white waitresses; Alexander's wrongful termination, which cost her seven days' worth of tips; Casino Queen's removing high-tip dollar slots from Alexander's assigned area; and Rogers' losing the opportunity to earn two weeks' worth of tips after she submitted her notice of resignation. Based on plaintiffs' estimates of their daily tips ($75 to $150 for Alexander, and $40 to $160 for Rogers), several of these allegations likely cost plaintiffs several hundred dollars, if not more. The loss of such a significant portion of plaintiffs' income was clearly "a decision causing a significant change in benefits." *Lewis*, 496 F.3d at 653. For the reasons explained above, plaintiffs also meet the similarly situated requirement, and the jury is the appropriate body to resolve the disputes of fact regarding Casino Queen's proffered reasons for these decisions.