In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1855

EMILIO MARTINO,

*Plaintiff-Appellant*,

*v.*

WESTERN & SOUTHERN FINANCIAL GROUP,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 3:08-CV-308—**Theresa L. Springmann**, *Judge.*

ARGUED OCTOBER 1, 2012—DECIDED APRIL 25, 2013

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.  Emilio Martino, a naturalized United States citizen born in Italy, worked briefly as a sales representative for Western & Southern Financial Group ("W&S"). Less than two months after W&S hired Martino, the company terminated his employment. Martino sued W&S for religious discrimination under Title VII and for defamation. Martino alleged, among other claims, that W&S discharged him based on his

religious beliefs. W&S countered that Martino's termination was due to his failure to provide documents verifying his eligibility for employment in the United States. The district court granted summary judgment to W&S, and we affirm. Martino's evidence neither calls into doubt W&S's explanation for his discharge nor establishes a prima facie case of defamation.

## I. BACKGROUND

On September 4, 2006, W&S, a financial services company headquartered in Cincinnati, hired Martino to work as a sales representative in its Mishawaka, Indiana office (the "Michiana office"). Shortly after Martino began working for W&S, he signed a sales representative agreement that prohibited him from "engag[ing] in any other business, profession or work for remuneration or profit without Western-Southern's prior written consent." At the time of Martino's employment, W&S only approved outside positions requiring five or fewer hours a week on average, not including Sundays, and an average weekly pay of one hundred dollars or less. To maintain their employment with W&S, associates who were not in compliance with the company's policy either resigned their unapproved outside positions or reduced the hours and pay of their outside work.

At the time he began working for W&S, Martino also served as a pastor of a small church in Union, Michigan. The same month his employment with W&S began, Martino submitted an outside position form for his pastoral job to the field human resource department, which

decided whether to approve outside positions at a weekly meeting. Erin Miller, a human resources generalist, conducted the initial reviews of outside position forms and presented the position to the rest of the department without identifying the employee requesting permission to hold the outside position. Because Martino did not specify his hours or pay on his form, Miller sent him an email requesting that information on September 18. She followed up with another email request on September 26 and that day, Martino informed Miller that his pastoral position involved eight to ten hours per week, not including Sundays, his average weekly pay was about three hundred dollars, and his pay might decrease in the future. The following day, Miller notified Martino that his pastoral position did not comply with the company's policy and that he would need to immediately terminate that position.

An email exchange between Andrew Sobol, who was the Michiana office's district sales manager and Martino's supervisor, and Miller ensued. Sobol told Miller that the outside position was the type of community service to which he encouraged sales representatives to dedicate three to five hours per week. Sobol asked Miller to clarify whether W&S forbade community service. Miller responded that Martino's position was different from approved community service activities because of the hours and pay. Sobol then told Miller that he believed Martino would do the pastoral work for free to keep the sales representative job. Sobol also suggested that Martino had inflated his estimate of the number of hours required for the outside position. On September 29,

Miller informed Sobol that Martino's request to hold the outside position was "denied due to consistent past practices regarding outside positions." After further questioning from Sobol about whether W&S employees could hold public service positions, Miller wrote that "[p]aid public service positions are subject to approval by [the human resource department] as stated in the policy."

On October 4, Martino emailed Miller the following:

It has become evident from your decision via e-mail on Sept. 27 telling me to terminate this "outside business venture" immediately that I need to address this situation. It has also become very evident from your e-mail conversations with my District Manager Mr. Sobol, that you have no intention of approving my public service position, which with God's blessings I will continue to serve in, as pastor of a small community church. Is the company denying my public service position and terminating my agent appointment with Western Southern? Please be specific so I will know what my position is with the company. Thank you.

Miller responded that W&S was not discharging Martino but asking that he resign his pastoral position because it did not comply with the company's policy.

At the same time Martino, Sobol, and Miller were discussing his outside position, Sobol and other W&S employees were attempting to verify Martino's eligibility to work in the United States. The Immigration

Reform and Control Act of 1986 ("IRCA") requires employers to complete documents verifying each employee's identity and eligibility to work in the United States within three business days of hiring using Form I-9, Employment Eligibility Verification ("I-9 form"). 8 U.S.C. § 1324a(a)(1)(B); 8 C.F.R. § 274a.2(a)(2), (b)(1)(ii). If an employee does not have the appropriate employment eligibility verification document, the employer must accept a receipt showing that the employee has applied for a replacement document. 8 C.F.R. § 274a.2(b)(1)(vi). The employee then has 90 days to produce the replacement document. *Id*. § 274a.2(b)(1)(vi)(3).

On September 5, the day after he was hired, Martino submitted an I-9 form. He provided his name, address, date of birth, and social security number, but did not show W&S documents verifying his eligibility. Martino told J. Maxine Edwards, the Michiana office's district administrator, that he could not find his social security card but would apply for a duplicate one and would also search his mother's house for the original. Edwards attached a note to Martino's I-9 form indicating that he was applying for a replacement social security card. She then sent the form to the field human resource department. Tarah Corlett, the division's human resource manager, became aware of Martino's incomplete I-9 form shortly after he submitted it. Edwards and Sobol spoke with Martino multiple times between September 5 and October 16 about the importance of completing the I-9 process.

On September 19, the Elkhart, Indiana office of the Social Security Administration ("SSA") verified Martino's social security number, but it did not allow him to apply for a replacement social security card because he did not have evidence of his naturalization. Instead, Martino received a document from the office verifying his social security number but also stating that the document "[did] not verify his right to work in the United States." The South Bend, Indiana office of the SSA also refused to allow Martino to apply for a duplicate social security card because he did not have documents establishing citizenship or lawful alien status. On October 6, that office gave him a letter that stated that the SSA was awaiting documentation from the Department of Homeland Security ("DHS"), which would take thirty to forty-five days to obtain. Martino gave the documents from both SSA offices to Edwards the days he received them, although he understood that they were not sufficient to meet the I-9 requirements.

From talking with Sobol about Martino's I-9 situation, Corlett, the human resources manager, learned that Martino could not obtain a replacement social security card until he obtained proof of his naturalization, which would take a significant amount of time to obtain according to Sobol. Corlett reviewed the SSA letters Martino received and determined that they were not sufficient to apply the "receipt rule," which would have given Martino a ninety-day grace period. She then concluded that Martino would not be able to complete the I-9 process within a reasonable time period and believed W&S could not continue to employ him without

documentation verifying his employment eligibility. On October 9, Corlett prepared a letter notifying Martino that W&S would place him on unpaid suspension if he did not produce a work authorization document in five business days. The letter directed Martino to fax the required documentation no later than October 13. Corlett discussed the letter with Sobol, who asked if the company could simply indefinitely suspend Martino. Corlett said that was not an option although Martino could resign within the five-day period. Sobol talked to Martino about the letter but did not mention the resignation option because he wanted Sobol to continue looking for his social security card. When Sobol talked to Corlett, however, he told her that he had discussed the resignation issue with Martino and that Martino did not want to resign.

Martino did not produce a document verifying his employment eligibility by October 13. Corlett explained Martino's I-9 situation to the director of the field human resource department and recommended termination to the division's vice president, who made the decision to discharge Martino. The October 16 termination letter stated that W&S was discharging Martino due to his failure to provide the necessary documentation.

At the time of Martino's termination, W&S's policy was to notify the state insurance department of all sales representatives' involuntary terminations of employment.[1]

---

[1] The record is not clear about whether W&S reported all terminations or only involuntary ones. Although Martino

(continued…)

As a result of this policy, Brenda Feige, W&S's enterprise licensing manager, sent the Indiana Department of Insurance a form letter that provided Martino's name and social security number and notified the department that Martino no longer represented W&S and that W&S no longer employed him. To that form letter, Feige attached a copy of Martino's termination letter, which identified his failure to provide employment eligibility verification documents as the reason for discharge. The insurance department investigated the social security number on Martino's insurance application, determined the number was valid, and closed its investigation.

Martino filed a charge with the Equal Employment Opportunity Commission, alleging discrimination based on religion and national origin and claiming that W&S terminated him for refusing to resign his outside position as a pastor. He later filed a second charge, alleging W&S retaliated against him for filing the first charge by sending his termination letter to the state insurance department. After receiving a right-to-sue letter on both charges, Martino sued W&S in state court. W&S removed the case to federal court. In his second amended complaint, Martino alleges religious discrimination, national origin discrimination, and retaliation,

---

(...continued)

raises this as a genuine issue of fact warranting a trial, it is not material because his termination was involuntary, and W&S would have reported it to the state insurance department under either approach.

all in violation of Title VII, as well as a state-law claim for defamation. The district court granted W&S's motion for summary judgment, finding that Martino had failed to raise a genuine issue of material fact and that the evidence before the court was insufficient to find that W&S's proffered reason for discharge was pretextual or that W&S defamed Martino. Martino appeals the district court's decision only on the religious discrimination and defamation claims.

## II. ANALYSIS

The issue before us is whether Martino has presented evidence sufficient to raise genuine issues of material fact as to: (1) whether W&S terminated his employment based on his religion; and (2) whether the company defamed him by reporting the termination to the state insurance department.[2] After reviewing the record, we determine that he has not.

---

[2] W&S made two procedural challenges, one alleging that Martino failed to file his lawsuit within the six-month contractual limitation specified in his employment agreement and the other that he failed to exhaust his administrative remedies on the retaliation claim. We need not reach these issues because we have resolved the Title VII discrimination claim on the merits and because Martino has not appealed the district court's decision on his retaliation claim.

**A. No Evidence of Pretext Presented**

Title VII makes it unlawful for an employer to discharge or discipline an employee because of that person's religion. 42 U.S.C. § 2000e-2(a)(1). An employee may prove discrimination under Title VII either directly, or indirectly using the burden-shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). Under the direct method, a plaintiff must "present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). Under the indirect method, a plaintiff establishes a prima facie case of discrimination by offering evidence that: "(1) he is a member of a protected class; (2) he was qualified for the applicable positions; (3) he suffered an adverse employment action; and (4) similarly-situated persons not in the protected class were treated more favorably." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). A plaintiff can also establish a prima facie case of religious discrimination by showing "that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997). If a defendant presents a legitimate, nondiscriminatory basis for the adverse employ-

ment action at the summary judgment stage, "the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to avoid the entry of summary judgment against it." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009). In this analysis, "[p]retext means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (internal quotation marks omitted). Generally, courts first consider whether a plaintiff has established a prima facie case of discrimination. *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006). However, when the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, courts may begin with the pretext inquiry. *See, e.g., Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007).

We begin here with the pretext analysis because W&S has offered a legitimate, nondiscriminatory basis for terminating Martino's employment. Specifically, the company argues that it discharged Martino because of his failure to provide it with documents verifying his employment eligibility. The burden shifts to Martino to show that this I-9 explanation is mere pretext. He attempts to do so by arguing that W&S treated comparators differently, that the timing of the termination decision was suspicious, and that he was entitled to ninety days to produce an employment verification document under the "receipt rule." None of these arguments—individually or collectively—shows that W&S's explanation is pretext or presents a genuine issue of material fact.

### 1. Treatment of Bacon Does Not Show Pretext

An employee may show that his employer's explanation for an adverse action is pretextual by showing that similarly situated persons outside the protected class received more favorable treatment from the employer. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847 (internal quotes omitted). "[T]he similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Id.* (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). It does, however, require "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Id.* (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)).

Martino argues that he was similarly situated to Michael Bacon, a district manager from another division. Like Martino, Bacon also had an I-9 issue. Martino contends, however, that Bacon received more favorable treatment from W&S. The evidence does not support Martino's position.

Bacon completed an I-9 form for W&S when the company hired him in 1999. At that time, he had temporary work authorization status and the proper documentation to complete the I-9 process. He renewed his status

in 2000 but failed to renew it again when it expired in February 2001. No one at the company knew Bacon was working without authorization until May 2006, when Jim Hanseman, the human resource manager for Bacon's division, discovered the problem. Hanseman and others in the field human resource department initially followed up with Bacon to obtain a document to re-verify his work authorization. In mid-July, Keith Payne, the vice president for Bacon's division and the person who had the ultimate decision-making authority for hiring and firing decisions in that division, took the lead. Thomas Johnson, the director of the field human resource department, learned of the issue in the summer of 2006.

From May through August 2006, Bacon assured Hanseman, Payne, and others involved that he was authorized to work in the United States. W&S allowed him time to produce the necessary documentation because he had previously verified his employment eligibility through the I-9 process, he expressly told the company that he was eligible, and he had a close relationship with Payne. After receiving a letter from Bacon's lawyer that called into question Bacon's ability to complete the I-9 process, the field human resource department took over. On Friday, August 11, 2006, Johnson met with Bacon and gave him five business days, until August 18, to have his lawyer contact W&S and explain how he would demonstrate his work authorization status. If he did not meet this deadline, W&S would terminate his employment. Bacon resigned on August 22.

The evidence in the record is not sufficient to establish that Bacon is a proper comparator for the purposes of Martino's Title VII religious discrimination claim. Specifically, Martino has not offered any evidence of Bacon's religion, religious practices, or outside religious employment. And without this information, we cannot determine whether Bacon falls within the same protected group as Martino or that W&S's explanation for terminating Martino's employment was pretextual.

Even if Bacon were outside Martino's protected group, the evidence in the record suggests he is not a suitable comparator for pretext purposes. Although the same human resources director—Johnson—had oversight of Bacon's and Martino's I-9 issues, and although they were both subject to the same IRCA requirements, the nature of their I-9 issues vis-à-vis the termination decision was substantially different. From the beginning of his employment, Martino was unable to establish that he was eligible for employment in the United States, and he gave W&S no indication that he would be able to produce the required documents in the necessary timeframe, even after more than a month passed. From this, W&S understood that Martino could not comply with IRCA. In contrast, Bacon had a history of authorized work with the company and led the company to believe that he could produce the necessary documents. Bacon's history of authorized work with the company, his relationship with the division's vice president, and the way he misled the company convinced W&S to grant him additional time to produce

the documents. But three months later, when it became clear that Bacon could not produce documents verifying his employment eligibility, Johnson met with him and gave him the same five-day warning that Martino received from Corlett. So ultimately, Bacon received the same treatment that Martino did: a five-day warning. The three-month delay between W&S's discovery of Bacon's I-9 issue and the five-day warning he received is not suspicious given the differences in Bacon's and Martino's employment histories with W&S. Furthermore, as with Bacon, W&S waited longer than the statutorily allowed three business days to allow Martino to produce his documents. Only after a month and when the company was convinced that he could not produce the documents did he receive a warning.

### 2. Treatment of Snyder Does Not Show Pretext

Martino next argues that because W&S did not terminate the employment of Tim Snyder, a W&S employee who maintained a non-religious outside position that violated the company's hour and compensation limits, the company's proffered explanation for his discharge is pretextual. Martino's argument falls far short. Snyder's outside position request form indicated that his part-time position as a music professor complied with the company's time and earning limitations—four-and-a-half to five hours per week and weekly pay of eighty dollars. Martino does not offer evidence that anyone in the human resources department or in management had access to information sug-

gesting otherwise.[3] Because W&S believed that Snyder's position complied with its policy, it would have had no reason to require Snyder to resign his outside position or to threaten him with termination if he refused to do so. In contrast, Martino expressly stated on his outside position form that his pastoral work exceeded the company's time and earnings limitations, and he refused to resign the outside position (to Miller's knowledge) or reduce its hours or pay. Given the differences in Martino's and Snyder's circumstances, we cannot conclude that W&S's treatment of Snyder undermined W&S's explanation for Martino's termination.

### 3. Timing of Termination Decision Does Not Suggest Pretext

Martino also claims that the timing of the I-9 compliance pressure is further evidence that W&S's explanation for his discharge is pretextual. Specifically, he argues that it is suspicious that Corlett sent the warning letter on October 9, just days after the October 4 email in which he refused to resign his outside position.

Suspicious timing can be circumstantial evidence of discrimination. *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 628 (7th Cir. 2001). But surviving summary judgment through a showing of pretext requires much more than

---

[3] According to W&S, Snyder's failure to comply with the outside position policy was not apparent to human resources or management until after Martino pursued this action.

the conclusory allegation of suspicious timing that Martino offers. *Id*. at 629 ("[T]iming alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that he was terminated for a reason other than that proffered by the employer.").

The only evidence in the record on timing supports W&S's explanation. W&S had been requesting an employment eligibility verification document from Martino since early September. On Friday, October 6, Martino gave W&S the letter from the South Bend SSA office explaining that the office was awaiting DHS authorization, which would take thirty to forty-five days to obtain. The next business day, Monday, October 9, Corlett responded to the latest news of the problems with Martino's documents with the warning letter. While Martino seems to suggest that W&S's decision to pursue the I-9 problem before resolving the outside position dilemma was discriminatory, nothing in the record shows that W&S pressed the verification issue to cover up discriminatory animus or that the timing of his discharge was suspicious.

### 4.   Martino Waived the Receipt-Rule Argument

Martino argues that because Corlett knew that he was entitled to the receipt rule's ninety-day grace period but declined to apply it, the only reasonable inference one can draw is that she wanted him discharged due to his outside religious position. He also contends that there is a genuine issue of fact as to whether the receipt he pos-

sessed, which Corlett found insufficient to satisfy the receipt rule, was adequate.

Because Martino did not raise this receipt-rule argument in the district court, he has waived it. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005). But even if he had not waived the argument, it does not advance his cause. Under the receipt rule, an employee who lacks an appropriate employment eligibility verification document may present his or her employer with a receipt showing that he or she has applied for a replacement document and the employee then has 90 days to produce the replacement document. *See* 8 C.F.R. § 274a.2(b)(1)(vi). Whether the receipt rule applied is not the issue in the pretext analysis. Rather, to show that W&S's nondiscriminatory explanation was pretextual, Martino must show that Corlett believed that Martino was entitled to a ninety-day grace period under the receipt rule but chose not to apply it. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."); *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 739 (7th Cir. 2011). The evidence in the record does not support Martino's assertion that Corlett knew the receipt-rule applied or his conclusion that her receipt-rule analysis was pretextual. Instead, it showed that Corlett analyzed the SSA letters Martino gave her, concluded they did not satisfy the receipt rule, and reported the documentation

issue to her supervisor, who terminated Martino's employment.

In sum, none of Martino's purported evidence of pretext is sufficient to survive summary judgment.

## B. No Actionable Defamation Claim

Martino alleges that W&S committed defamation by implication when it sent notice to the state insurance department that it had terminated his employment. Indiana requires insurers to notify the state if an agent has violated an insurance law, provided incorrect or misleading information in a license application, been convicted of a felony, or committed any one of several enumerated financial or insurance-related crimes and misdeeds. Ind. Code § 27-1-15.6-15. In his view, because the statute requires reporting for specific bad acts, W&S implied that his discharge was the result of one of those acts.

In Indiana, defamation is actionable when communication exists with four elements: "defamatory imputation, malice, publication, and damages." *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006). Defamation is either *per se* or *per quod*. *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). Defamation *per se* exists when a communication imputes: "(1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Id*. All other defamatory communications are defamation *per quod*, which requires a showing of special

damages, *id*. at 597, or "damages that are pecuniary in nature and that have been actually incurred as a natural and proximate consequence of the wrongful act." *Tacket v. Delco Remy Div. of Gen. Motors Corp.*, 937 F.2d 1201, 1206 (7th Cir. 1991) (applying Indiana law) (quoting *Stanley v. Kelley*, 422 N.E.2d 663, 668 (Ind. Ct. App. 1981)). The question of whether a statement is defamatory or subject to defamatory inference is at first a question of law for the court. *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999).

Martino's defamation claim fails because the letters sent to the state insurance department are not defamatory. "Any statement actionable for defamation must not only be defamatory in nature, but false." *Trail*, 845 N.E.2d at 136; *accord Doe v. Methodist Hosp.*, 690 N.E.2d 681, 686-87 (Ind. 1997). Nothing in the form and termination letters sent to the state insurance department was false. Martino suggests that the letters defamed him because they were the vehicle for excessive reporting designed to harm his reputation. This argument is unpersuasive. Although the Indiana Code did not require W&S to report Martino's termination to the state insurance department, it did not prevent the company from doing so. No evidence in the record suggests that W&S singled Martino out by reporting his discharge to the state. Rather, W&S simply followed the company's policy of reporting all involuntary terminations.

Even if we found that the form and termination letters were defamatory, Martino's claim would still fail

because he has not established a prima facie case of defamation *per se* or *per quod*. Nothing on the face of the letters sent to the state insurance department imputes criminal conduct or misconduct in the insurance profession. Rather, they simply state that Martino was no longer in the company's employment and that he failed to provide employment eligibility documents. Martino, however, argues that the letter W&S sent to the state insurance department was defamation *per se* because it implied criminal conduct or misdeeds in his trade. The Supreme Court of Indiana has held that a plaintiff has alleged defamation *per se* when the words are "so obviously and naturally harmful that proof of their injurious character can be dispensed with." *Baker v. Tremco, Inc.*, 917 N.E.2d 650, 658 (Ind. 2009) (quoting *Levee v. Beeching*, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000)). Because the letters do not mention Section 27-1-15.6-15 of the Indiana Code, to reach Martino's conclusion, we would have to find that the insurance department official who received the letter would automatically understand that W&S sent the letter to comply with the code provision requiring reporting for criminal activity and professional misconduct. This is highly unlikely, given the fact that W&S attached the termination letter, which clearly stated the reason for Martino's discharge. Regardless, the additional step of placing the letter in the context of state statutes to understand its implications shows that the defamation alleged is *per quod*. *See Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) ("[I]f the words used are not defamatory in themselves, but become so only when understood in the context of

extrinsic evidence, they are considered defamatory *per quod*."). Under a *per quod* analysis, Martino's defamation claim fails because he has not presented any evidence of special damages. Instead, he alleges only humiliation and embarrassment, which alone are not sufficient to plead a prima facie case of defamation.

As with his Title VII claim, Martino has not offered evidence creating a genuine issue of material fact that would require a trial to resolve.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.