In the

United States Court of Appeals

For the Seventh Circuit

No. 13-3658

CUNG HNIN,

*Plaintiff-Appellant*,

*v.*

TOA (USA), LLC,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-00116-SEB-MJD — **Sarah Evans Barker**, *Judge*.

ARGUED APRIL 15, 2014 — DECIDED MAY 5, 2014

Before RIPPLE and WILLIAMS, *Circuit Judges*, ST. EVE, *District Judge.**

ST. EVE., *District Judge*. On January 25, 2012, Cung Hnin ("Hnin") filed a four-count Complaint against his former

---

* The Honorable Amy J. St. Eve, of the United States District Court, Northern District of Illinois, sitting by designation.

employer TOA (USA), LLC ("TOA") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*, pursuant to the district court's original jurisdiction, 28 U.S.C. § 1331, and two state law claims pursuant to the district court's supplemental jurisdiction, 28 U.S.C. § 1367(a). On July 22, 2013, TOA filed a motion for summary judgment under Federal Rule of Civil Procedure 56(a), and on October 31, 2013, the district court granted TOA's summary judgment motion in full. On appeal, Hnin challenges the district court's summary judgment ruling on his Title VII national origin discrimination claim and his Title VII retaliation claim. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

Hnin is of Chin ethnicity from the country of Myanmar, formerly known as Burma. In February 2007, Hnin began working at TOA's Mooreseville, Indiana automotive metal stamping plant as a temporary associate employed by Staffmark. In August 2007, TOA hired Hnin as an evening shift full-time associate in the metal stamping department. Hnin performed handwork, such as, inspecting stamping parts for defects, and re-working defective parts by using air-powered hand grinders and buffers. In addition, Hnin worked as a press assistant on production presses where he would catch parts from the conveyor belt as they were discharged from the presses, conduct spot inspections of the parts, and place the parts on pallets.

Upon being hired, all TOA associates, including Hnin, received a handbook setting forth TOA's standards of conduct. Under Section 401, Rules and Standards, the handbook states that "[u]nder normal circumstances, TOA (USA) en-

dorses a policy of progressive discipline in which it attempts to provide associates with notice of deficiencies and an opportunity to improve." Rules and Standards Section 401 also states that some policy infractions are serious enough to warrant probation or dismissal without a prior warning, including violations of TOA's sexual harassment policy. TOA's sexual harassment policy states in relevant part:

> TOA (USA) is committed to providing a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal opportunities and prohibits discriminatory practices, including sexual harassment. Accordingly, TOA (USA) expects that all relationships among persons will be business-like and free from bias, prejudice and harassment.

> Unwelcome sexual conduct that interferes with an individual's job performance or creates an intimidating, hostile, or offensive environment is prohibited. All associates are prohibited from engaging in unwelcome sexual conduct or making unwelcome sexual overtures, whether verbal or physical.

> Behavior that constitutes sexual harassment is unacceptable in the workplace and in any work-related setting outside the workplace, including business-related social events.

> TOA (USA) encourages reporting of all perceived incidents of sexual harassment, regardless of the offender's identity or position and regardless of whether the offender works for TOA (USA), a client or a

supplier. TOA (USA) encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken.

All complaints of harassment will be investigated promptly. Associates are required to cooperate in any investigation, which may include individual interviews with the parties involved, and, where necessary, with individuals who may have observed an alleged harassment or may have relevant knowledge. The complaint and the investigation will be handled with sensitivity, and confidentiality will be maintained throughout the investigative process, to the extent practical and appropriate under the circumstances, in light of the important privacy interests of all concerned.

TOA (USA)'s policy equally prohibits harassment on the basis of race, color, religion, national origin, sexual orientation, age and/or disability. Any associate who has any concerns or questions about this policy should talk with Human Resources and refer to the Policies on Harassment and Sexual Harassment.

In November 2010, April Brock began working at TOA as a Staffmark temporary employee. She worked approximately 20-24 feet from Hnin's work station and had the same supervisor. On December 10, 2010, Brock reported to the on-site Staffmark representative that Hnin had been harassing her for some time. The Staffmark representative then brought the matter to Human Resources Manager Tonda Capps' attention. Thereafter, Capps and Tim Clayton, who served as TOA's Executive Director of Operations during the

relevant time period, initiated an investigation into Brock's harassment complaint.

During her investigative interview, Brock told Capps and Clayton that Hnin had made inappropriate comments to her since she started working at TOA in November 2010, that she had tried to ignore his comments, and that she had asked him to stop on several occasions. The subject of the harassment involved a co-worker, Steve Miller. Specifically, Hnin made body gestures, such as putting his two index fingers together and making kissing noises, suggesting that Miller and Brock were together. On one occasion, Hnin sang the song "Oh, My Darling, Oh, My Darling" to Miller and Brock. At another time, when Brock came out of the bathroom and Miller walked around the corner, Hnin commented to them "that was a quick one." At her interview, Brock also explained that Hnin often instructed their co-workers to slow down so they could work more overtime and that on one occasion, Hnin acted in an intimidating manner. She identified several co-workers who observed Hnin's misconduct, including Miller, Jose Herieda, and Ascuncion Fajardo.

After Clayton and Capps interviewed Brock, they interviewed Herieda, who stated that Hnin complained a lot, acted like he was the boss, had a bad temper, and tossed handwork parts around on two occasions. Capps and Clayton also interviewed Miller, who explained that Hnin made suggestive remarks about Brock being his girlfriend. Fajardo informed Capps and Clayton that Hnin often got angry, acted aggressively, and made him uncomfortable. Also, Fajardo stated that Hnin told another associate to slow down his work because people wanted to work overtime.

Thereafter, Clayton and Capps interviewed Hnin. Clayton reviewed Brock's complaint with Hnin and then advised him that TOA considered the matter to be serious. Further, Clayton explained the investigation process and which witnesses they had interviewed. In response, Hnin appeared to be aggravated and spoke in an elevated tone. He denied any wrongdoing and also asked that the witnesses be brought into the meeting so he could confront them. Clayton told Hnin that this request was not in line with TOA's procedures. Also, Clayton informed Hnin that his co-workers reported that he was aggressive and intimidating and that he had directed them to slow down so they could earn overtime compensation. Again, Hnin insisted that Clayton interview his co-workers in front of him. At that point, Clayton decided to terminate Hnin's employment with TOA.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo and construe all facts and reasonable inferences in the light most favorable to the non-moving party, in this matter, Hnin. *See Wilson v. Cook County*, 742 F.3d 775, 779 (7th Cir. 2014); *Hussey v. Milwaukee County*, 740 F.3d 1139, 1142 (7th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting Fed.R.Civ.P. 56(a)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment has the burden of es-

tablishing that no genuine dispute exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (citation omitted).

### III. ANALYSIS

### A. Title VII National Origin Claim

"Title VII prohibits employers from discriminating based on 'race, color, religion, sex, or national origin.'" *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (quoting 42 U.S.C. § 2000e–2(a)). On appeal, Hnin argues that he has established a triable case of national origin discrimination under the indirect method of proof. To move beyond summary judgment under the indirect method, a plaintiff must first make out a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which includes four elements: (1) plaintiff is a member of a protected class; (2) plaintiff was meeting his employer's legitimate job expectations; (3) plaintiff suffered an adverse employment action; and (4) plaintiff's employer treated at least one similarly situated employee not in the plaintiff's protected class more favorably. *See Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). If the plaintiff establishes a prima facie case of intentional discrimination, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Andrews*, 743 F.3d at 234; *Alexander*, 739 F.3d at 979. If the employer meets this burden, the burden shifts back to the plaintiff to present evidence that the em-

ployer's reason is pretext for unlawful discrimination. *See Andrews*, 743 F.3d at 234.

### 1. Similarly Situated Comparators

TOA does not challenge that Hnin is a member of a protected class nor that his termination constituted an adverse employment action. Accordingly, we turn to Hnin's argument that he has presented evidence creating a genuine dispute for trial that TOA treated similarly situated employees, who were not Chin, more favorably. A similarly situated employee must be directly comparable to the plaintiff in all material respects, which is a common-sense, flexible analysis of relevant factors. *See Alexander*, 739 F.3d at 981. These relevant factors often include whether the employees "had the same supervisor, were subject to the same employment standards, and engaged in similar conduct." *Majors v. General Elec. Co.*, 714 F.3d 527, 538 (7th Cir. 2013). Although the similarly situated inquiry is not a mechanical comparison, it requires enough common factors to determine if intentional discrimination was at play. *See Martino v. Western & So. Fin. Group*, 715 F.3d 195, 203 (7th Cir. 2013). In other words, "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

The parties discuss four American-born comparators, including Tom Smith, Scott Reed, Travis Vollmer, and George Cross. Hnin argues that TOA treated these employees more favorably because, although TOA terminated their employment as a result of their misconduct, TOA gave certain com-

parators verbal or written warnings before terminating their employment. Also, Hnin maintains that TOA's investigations into the comparators' misconduct were more thorough or at least took longer. We examine the evidence regarding these four individuals to determine whether Hnin raises a genuine dispute of material fact for trial that TOA treated at least one of these comparators more favorably.

First, in April 2007, a female co-worker accused Smith of making offensive comments, including Smith's statement that he wanted to "skull fuck" her. Smith further referred to her as a "dumb fuck," "panty sniffer," and "stupid ass." Like Hnin, TOA terminated Smith without prior warning or discipline. Nonetheless, Hnin attempts to distinguish TOA's treatment of Smith because TOA fired Smith the day after its investigation into his misconduct, whereas TOA fired Hnin on the same day of his investigation. This one day discrepancy, however, is a distinction without a difference and does not suggest more favorable treatment or raise a reasonable inference that unlawful discrimination was at play.

Next, in October 2010, TOA terminated Reed for yelling at a female employee. The record reflects that Reed yelled at the employee when she asked him if she could bring him something for lunch. Hnin argues that TOA treated Reed more favorably because TOA had given Reed a previous warning about his conduct prior to terminating his employment. Indeed, TOA had warned Reed in 2007 about his angry outbursts, which included him losing his temper and throwing a computer mouse. Unlike Hnin, however, Reed's conduct in both 2007 and 2010 was not sex-based harassment.

Also, TOA terminated Vollmer's employment in March 2007 after he hit a male associate in the chest with his fist and pulled on his shirt. Likewise, TOA terminated Cross in June 2010 after he argued with a male co-worker and physically threatened him. Although TOA gave these employees warnings prior to their termination, their conduct was not sex-based, and thus distinguishable.

Viewing the evidence and all reasonable inferences in Hnin's favor, the proposed comparators' misconduct, outside of Smith's sex-based harassment, was not similar enough to infer, in the absence of some other explanation, that TOA's different treatment of Hnin was based on Hnin's national origin or any unlawful animus. *See Rodgers v. White,* 657 F.3d 511, 517 (7th Cir. 2011). Regarding Smith's sex-based harassment, TOA's response was nearly identical to its response to Hnin's misconduct, namely, TOA terminated Smith's employment without warning shortly after TOA investigated Smith's misconduct. In sum, Hnin has not set forth evidence that TOA treated Smith more favorably in the first instance. Accordingly, Hnin has not presented a triable issue of fact concerning the similarly situated element of his prima facie case of national origin discrimination.

## 2. Legitimate Reasons/Pretext

Next, we turn to TOA's argument that it had legitimate reasons for terminating Hnin's employment and that Hnin has not presented evidence that these reasons were pretext for national origin discrimination.[1] "The focus of the pretext

---

[1] Under the circumstances, our analysis of TOA's legitimate job expectations merges with our pretext analysis. *See Smiley v. Columbia Coll. Chi.,* 714 F.3d 998, 1002 (7th Cir. 2013); *Vaughn v. Vilsack,* 715 F.3d 1001, 1007 (7th Cir. 2013).

inquiry is whether the proffered reason is a lie." *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002-03 (7th Cir. 2013); *see also Majors*, 714 F.3d at 539 ("An employer's proffered non-discriminatory reason for the adverse employment action is pretextual if it was a lie."). "An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). In other words, the "question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)).

The parties do not dispute that Clayton was the final decision-maker under the circumstances. Evidence in the record supports that Clayton terminated Hnin's employment based on Clayton's review of all the information obtained during TOA's investigation of Brock's complaint, including Hnin's sex-based harassment, intimidating conduct, instructions to his co-workers to work more slowly to obtain overtime, and defiance during his investigative interview.

On appeal, Hnin first argues that there is a genuine dispute for trial whether his conduct toward Brock rose to a level of sexual harassment, thereby, raising the inference that this reason for his termination was dishonest. Hnin contends that he was merely teasing Brock and that his childish teasing was not sexual in nature. Specifically, Hnin asserts that "[t]here is a difference between harassing and objectionable misconduct," and attempts to define what he considers sexual harassment based on case law in which we discuss Title VII hostile work environment claims. These cases do not in-

form our analysis because TOA's harassment policy—not whether Hnin created a Title VII hostile work environment at TOA—is at issue. In fact, we have previously held that an employer can discharge an employee based on inappropriate conduct not amounting to actionable sexual harassment to avoid future liability. *See Hall v. Bodine Elec. Co.,* 276 F.3d 345, 359 (7th Cir. 2002), *overruled on other grounds, Hill,* 724 F.3d at 967-68. In the same vein, Hnin's argument that Brock never considered his conduct as sexual harassment is equally unavailing. Again, the focus of our pretext determination is TOA's honest belief that Hnin violated its harassment policy. *See Smiley,* 714 F.3d at 1005.

Hnin also argues that there was no evidence in the record that he intimidated or threatened his co-workers or that he told his co-workers to slow down to obtain more overtime. *See Mullin v. Temco Mach., Inc.,* 732 F.3d 772, 778 (7th Cir. 2013) ("Where an employer proffers 'more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons.'") (citation omitted). Contrary to Hnin's assertion, both Brock and Fajardo informed Clayton that Hnin's conduct was intimidating and that Hnin instructed his co-workers to slow down to obtain more overtime work.

Moreover, Hnin does not discuss Clayton's fourth reason for terminating his employment, namely, Hnin's defiant conduct during his investigative interview. During his interview, for example, Hnin did not listen to Clayton and insisted that Clayton interview witnesses in Hnin's presence. Further, Hnin denied wrongdoing, was aggravated, and spoke with an elevated tone of voice. Hnin does not dispute that he acted in this manner, and this conduct establishes that he

failed to abide another aspect of TOA's harassment policy—he did not cooperate in his own investigation.

Next, Hnin suggests that TOA's violation of its own policy establishes pretext. More specifically, Hnin maintains that TOA violated its own policy because it skipped any disciplinary steps and terminated him immediately without warning. TOA's standards of conduct policy, however, provides that "[s]ome infractions are serious enough to warrant the probation or dismissal of the associate without prior warning." TOA's handbook lists these infractions, including violations of its sexual harassment policies. In short, because TOA did not violate its own policy, this pretext argument fails. *See Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 828 (7th Cir. 2006). Hnin's related argument that TOA did not enforce its harassment policy evenhandedly based on comparator evidence is equally unavailing because, as discussed in detail above, TOA terminated Smith's employment without warning after conducting an investigation into his sex-based harassment and the other comparators' misconduct was not similar enough to Hnin's conduct to raise a genuine dispute of material fact for trial.

Viewing the evidence and all reasonable inferences in Hnin's favor, he has not pointed to any evidence suggesting that Clayton, as the final-decision maker, did not honestly believe his reasons for terminating Hnin's employment at TOA. Therefore, we affirm the district court's judgment as to Hnin's national origin discrimination claim.

## B. Title VII Retaliation Claim

Hnin bases his Title VII retaliation claim on complaints he made at a December 14, 2009 meeting with Clayton, Capps, and Chris Wernle, a Stamping Area Manager. At that meeting, Hnin voiced his concerns that TOA did not promote Chin associates in team leader positions as frequently as American-born associates. Team leaders are hourly-paid associates, who occupy a role between other associates and shift supervisors. Hnin noted at the meeting that TOA passed over two Chin associates, Pan Thawng and Sang Heu, for team leader positions. In response, Clayton explained that TOA selected the best qualified candidates and that there had been no discrimination. Also, Clayton advised Hnin that Thawng and Heu could speak with TOA directly if they had any concerns. Shortly after this discussion, TOA promoted Thawng and Heu to team leader positions.

"Title VII forbids retaliating against an employee 'because he has opposed any practice made ... unlawful ... by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Collins v. American Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013) (quoting 42 U.S.C. § 2000e–3(a)). On appeal, Hnin argues that the district court erred in granting summary judgment on his retaliation claim because he presented sufficient direct evidence of retaliation to withstand TOA's motion for summary judgment. To survive summary judgment on a Title VII retaliation claim under the direct method of proof, a plaintiff must submit evidence from which a jury could reasonably conclude that (1) he engaged in statutorily protected activity;

(2) he suffered a material adverse action; and (3) a causal link between the two. *See Porter v. City of Chi.*, 700 F.3d 944, 957 (7th Cir. 2012). "[R]etaliation claims under Title VII require traditional but-for causation, not a lesser 'motivating factor' standard of causation." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ___, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)).

The parties do not dispute that Hnin's December 2009 complaint to management that TOA failed to promote Chin associates to the position of team leader is a statutorily protected activity nor do they dispute that Hnin's December 2010 termination was a materially adverse action.[2] Therefore, we look to whether Hnin has presented sufficient evidence to raise a genuine dispute of material fact for trial that there is a causal connection between the two. Because there is no direct evidence of TOA's motive, Hnin relies on four categories of circumstantial evidence to establish a "convincing mosaic," including suspicious timing, whether TOA treated similarly situated co-workers more favorably, evidence of pretext, and statistical evidence. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013).

Under most circumstances, suspicious timing alone does not create a triable issue on causation, *see Milligan v. Bd. of*

---

[2] A plaintiff can base his Title VII retaliation claim on any materially adverse action regardless of whether it affects his terms or conditions of employment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Chaib v. Indiana*, 744 F.3d 974, 986-87 (7th Cir. 2014). Here, Hnin's claims are based on his termination, which qualifies as an adverse employment action. *See Andrews v. CBOCS West, Inc.*,743 F.3d 230, 235 (7th Cir. 2014).

*Trs. of So. Ill. Univ.,* 686 F.3d 378, 389-90 (7th Cir. 2012), and the twelve months between Hnin's complaints and his termination is certainly not close enough in time to establish causation without more evidence supporting an inference of a causal link between the two events. *See Majors,* 714 F.3d at 537; *see, e.g., Porter,* 700 F.3d at 957 (timing not suspicious when events separated by a year) (collecting cases).

In addition to suspicious timing, Hnin relies on his similarly situated comparator and pretext arguments to support the causal connection requirement. As discussed above, we have soundly rejected these arguments. Hnin's attempt to use statistical evidence to show that TOA had a general pattern of not promoting Chin associates fares no better because this evidence does not take into account TOA's nondiscriminatory explanations nor the number of Chin associates who applied and were qualified for promotions. *See Radue v. Kimberly – Clark Corp.,* 219 F.3d 612, 616-17 (7th Cir. 2000); *see also Tagatz v. Marquette Univ.,* 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation."). Put differently, Hnin's statistical evidence fails to give sufficient context to permit an inference of retaliatory intent.

While we view all reasonable inferences in Hnin's favor, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packaging Int'l Inc.,* 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 517 F.3d 470, 473 (7th Cir. 2008)). Construing the evidence and reasonable inferences in Hnin's favor, he has not presented a convincing mosaic of circumstantial evidence that would permit a jury to infer that TOA retaliated against him for voicing his concerns about the promotion of Chin associ-

ates, especially in light of the fact that shortly after Hnin voiced his concerns, TOA promoted two Chin associates to team leadership positions. The district court correctly awarded summary judgment to TOA on Hnin's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.