NONPRECEDENTIAL DISPOSITION
To be cited only in accordance
with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 6, 2014
Decided August 1, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-3304

ISAAC COX,
     *Plaintiff-Appellant*,

  *v.*

BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN, *et al.*,
     *Defendants-Appellees*.

Appeal from the
United States District Court for the
Northern District of Illinois,
Eastern Division.

No. 10 C 2535

Joan Humphrey Lefkow,
*Judge*.

**O R D E R**

Isaac Cox, who is black, worked as a railroad engineer for the Grand Trunk Western Railroad. Grand Trunk Western is a union shop and must dismiss any employee who fails to join either the Brotherhood of Locomotive Engineers and Trainmen or the United Transportation Union. In April of 2009, Cox was fired ostensibly for failing to comply with this union-shop agreement. He claims that his

termination was the result of racial discrimination on the part of Grand Trunk Western, the Brotherhood, and the Brotherhood's local division (Division 33). The district court granted summary judgment in favor of the defendants. We affirm. Cox has failed to provide any evidence that his termination was racially motivated.

## I. Background

In January 2008 Cox resigned from his position as a railroad engineer at Union Pacific Railroad to take a position at Grand Trunk Western. Cox completed his probationary period and was certified as a locomotive engineer on April 7, 2008 (his "seniority date"). Pursuant to the union-shop provision of the collective-bargaining agreement contained in his contract, Cox was required to join and maintain membership in either the Brotherhood or United Transportation Union within 60 days of becoming a locomotive engineer. Members can pay their dues either through payroll deduction or directly to the local division. The union monitors compliance with this requirement and is responsible for initiating termination proceedings for noncompliance.

Cox neither paid dues nor submitted paperwork to join either union during his first year at Grand Trunk Western. While at Union Pacific, Cox had been a member in good standing of the Brotherhood. He believed that this membership transferred to his new position. That belief turned out to be erroneous. He was aware of the union-shop requirement and knew he was supposed to be paying dues after his probationary period ended but noticed that they were not being deducted from his paycheck. After asking around, he came to believe the problem was caused by a delay in processing; some of his coworkers had to wait several months before their dues were automatically deducted from their paychecks.

To understand what happened next, we need to briefly discuss the Brotherhood's structure and leadership. The union's authority is allocated among three divisions: the National Division, the General Committee of Adjustment, and the local divisions. Each has its own bylaws and officers. John Karakian was chairman of the General Committee, which is tasked with interpreting the collective-bargaining agreement and monitoring several local divisions operating under that agreement. The Brotherhood appears to have started cracking down on compliance with the union-shop agreement in late 2008. Karakian asked Division 33's chairman Terry Tindol for an updated seniority list. Karakian noticed discrepancies between this list of engineers, the National

Division's list, and Grand Trunk Western's list. Tindol obtained his list from Division 33's secretary-treasurer James Bess, who then became aware that Cox had not been paying dues.

Bess contacted Cox by phone regarding his noncompliance on January 24, 2009.[1] During that conversation, Cox explained his circumstances and expressed his belief that he was already a member of the Brotherhood. The union then mailed Cox an application, which he received in late February. He claims he filled out that application but did not submit it. A few days after receipt, he ran into Bess on the job. Bess had extra applications in his satchel, and Cox filled one out and returned it on the spot. By this point, ten months had passed since Cox's seniority date.

Bess asked Tindol whether Cox could catch up by authorizing double payments from his paychecks. This practice had previously been used with three other railroad employees: Terry Damsch (seniority date September 14, 2007); Gabriel Maldonado (same seniority date); and Frank Ripoli (seniority date November 10, 2007). These employees submitted their union applications when their probationary periods ended. Damsch and Maldonado said in declarations that they were given union applications about one month after starting work. We have no such information regarding Ripoli. True of all three is that no deductions were taken from their paychecks until August 2008 (ten months after Damsch and Maldonado's seniority date). Bess arranged for each to catch up on their dues via increased payroll deductions; the parties point to nothing in the record to suggest Karakian was aware of these arrangements, and he testified in his deposition that he was not informed about them. All three were paying dues when Karakian requested the lists in late 2008.

Tindol took this option to Karakian, who ultimately rejected it. Bess then told Cox to sign a "promissory note" stating he would pay his dues in full. The next day, at Tindol's suggestion, Bess told Cox to instead write a check for the full amount of his back dues. Cox provided the check and Bess provided a receipt. Bess then gave the check to Tindol, who told Karakian that Cox had provided a check for the full amount owed. On March 6 Karakian told Tindol to give the check back, stating that the collective-bargaining agreement and bylaws did not provide for them to do business in this manner. (It appears the bylaws are silent on the matter, though Karakian as chairman had substantial discretion in exercising his duties.)

---

[1] The record is not clear whether the two spoke on January 24 or whether Bess was unable to reach Cox on that date and the two spoke for the first time two weeks later. The difference does not alter our analysis.

That same day Karakian notified the railroad via letter that Cox was to be fired for "brazen non-compliance" with the union-shop agreement.[2] Cox requested and received a hearing, at which he argued that his noncompliance should be excused, though conceding that he had failed to pay his dues. The hearing was the first time Karakian and Cox had met. There is no evidence in the record that Karakian was aware of Cox's race before that meeting. Timothy Rice, the railroad's director of labor relations who also participated in the hearing, notified Cox by letter dated April 6 that he had failed to demonstrate compliance and would be terminated.

The day after Karakian requested termination of Cox's employment, Karakian sent another letter directing that Harold Mayer, a white engineer at Grand Trunk Western, should also be fired. This letter too cited "brazen non-compliance" with the union-shop agreement as grounds for dismissal and was essentially identical to the letter sent concerning Cox. Mayer had dropped out of the Brotherhood in June 2008 and quit paying dues (apparently intending to join the United Transportation Union, though his application didn't reach that union until two days after he received notice of his impending termination). Mayer did not request a hearing. Rather, he asked Rice directly for reinstatement but was denied.

After pursuing administrative remedies, Cox filed suit in the Northern District of Illinois alleging that the termination was the result of racial discrimination. He named Grand Trunk Western, the Brotherhood, and Division 33 as defendants. The railroad successfully argued that Cox's claims against it were precluded by a prior class-action settlement. Cox does not appeal that decision, and the railroad is not a party to this appeal. The district court also entered summary judgment for the Brotherhood and Division 33. Cox argues on appeal that summary judgment was improper.

## II. Discussion

Cox has failed to provide any evidence to demonstrate that the union recommended his termination because of his race. The evidence may well show that he

---

[2] There is some question as to whether Tindol requested that this letter be sent. Tindol stated in his deposition that Karakian was solely responsible for the letter, while Karakian's deposition testimony is ambiguous. At one point Karakian seemed to indicate that Tindol requested the letter to be sent. Later in the deposition, he clearly indicated that Tindol was not involved. However, it is not disputed that Karakian in fact sent the letter requesting termination, and Cox conceded below that it was Karakian who made the decision to reject his attempts to repay his back dues.

got a raw deal. The purpose of a union shop is to ensure that every employee joins a union. Cox wanted to be in the union. Cox thought he *already was* in the union. Though he had not been diligent in filling out the necessary paperwork and paying his dues, he offered to pay his back dues in a lump sum. Viewing the facts in the light most favorable to Cox, the union's response to his somewhat unique circumstances strikes us as unduly rigid. But the evidence does not suggest that the union's recommendation that he be terminated was racially motived or that the union's stated reason—failure to comply with the union-shop agreement—was pretextual.

Cox relies on the indirect method of proof to demonstrate discrimination. Under the indirect method, Cox must establish a prima facie case of discrimination with evidence that: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013). If he satisfies his burden, the Brotherhood and Division 33 have an opportunity to identify a legitimate, nondiscriminatory reason for their actions. *Id*. The burden then shifts back to Cox to demonstrate that the given reason was pretextual. *Id*.

Cox's first problem is that he fails to provide evidence of similarly situated employees outside his protected class that were treated more favorably. "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). The requirement's purpose "is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id*. (internal quotation marks omitted). The comparators put forward by Cox—Damsch, Maldonado, and Ripoli—do not meet that definition. Unlike Cox, they had all submitted their applications in a timely fashion and followed up after noticing their dues were not being withheld. They had done everything needed on their end to become members in good standing of the union; their dues were not being deducted solely due to the failures of Grand Trunk Western's payroll department. Cox, on the other hand, had taken no affirmative steps to ensure his membership was current or to confirm that he had completed the required paperwork to authorize payroll deductions. His noncompliance was due solely to his inaction. These differences are the sort of explanatory variables that the similarly

situated analysis is meant to eliminate.[3]

Cox claims on appeal that we should disregard his comparators' diligence because two of them—Damsch and Maldonado—were provided with applications without asking while he was not. However, this argument gets us no closer to an inference that the union recommended Cox's termination because of his race. It doesn't somehow render them similarly situated employees—material differences; namely, their follow-up concerning unpaid dues, remain. And the relevant favorable treatment on this point is not that they were given applications, but that their termination was not recommended. If Cox is implying that the union systematically assisted white railroad workers in joining its ranks while not assisting minority workers, that disparate treatment could potentially go to a different claim than that raised here. As to the claim in this case, Cox knew he needed to join the union and pay dues, slept on those obligations, and cannot provide evidence of an employee whose termination was not recommended under those circumstances. It is Cox's burden to raise an inference of discrimination, and he has failed to do so.

Even if he could, he would not be able to demonstrate that the union's stated reason for recommending his termination was a pretext for discrimination. To show pretext Cox must demonstrate that the union did not "honestly believe" the reasons it offered to explain their actions, not just that the "stated reason was inaccurate or unfair." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014). First, nothing in the record shows that Karakian knew of Cox's race when requesting his termination; the two did not meet in person until the administrative hearing.[4] Additionally, Karakian's treatment of Mayer demonstrates evenhandedness. Even if Cox's circumstances were more sympathetic than Mayer's, Cox and Mayer were fired at the same time and for the same reasons. The letters submitted to Grand Trunk Western from the union asking that these two be terminated were nearly identical. Karakian's review of union records indicated Cox and Mayer failed to comply with the union-shop

---

[3] Though not raised by the district court or the parties, it appears Cox and his comparators were subject to different decision-makers. According to the plaintiff's own statement of additional material facts, Bess arranged for the deduction of Damsch's, Maldonado's, and Ripoli's back dues. Nothing suggests Karakian was involved. Cox concedes that Karakian made the decision not to allow him to catch up on his dues in the same manner.

[4] This point would hold even if, as Cox at times suggests, Tindol rather than Karakian in substance made the decision to recommended Cox's termination. Cox's counsel conceded at oral argument he could not point to any evidence in the record showing that Tindol knew of Cox's race. Only Bess had met with Cox in person before his termination was recommended.

agreement, and both suffered the same fate.

At bottom, the evidence may well show that Cox was treated unfairly, but it does not show that he was treated unfairly because he is black.

AFFIRMED.